UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CAROL MARIE EGE,

        Petitioner,

                           CASE NO. 5:11-CV-10573
   v.                       JUDGE JOHN CORBETT O'MEARA
                           MAGISTRATE JUDGE PAUL J. KOMIVES

MILLICENT WARREN,

        Respondent.

_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

| | | | |
|---|---|---|---|---|
| I. | RECOMMENDATION | | | 2 |
| II. | REPORT | | | 2 |
| | A. | *Procedural and Factual Background* | | 2 |
| | B. | *Standard of Review* | | 10 |
| | C. | *Sufficiency of the Evidence (Claim I)* | | 13 |
| | | 1. | *Clearly Established Law* | 13 |
| | | 2. | *Analysis* | 15 |
| | D. | *Suggestive Identification (Claim II)* | | 19 |
| | | 1. | *Clearly Established Law* | 19 |
| | | 2. | *Analysis* | 21 |
| | E. | *Right to Present a Defense (Claim III)* | | 27 |
| | | 1. | *Clearly Established Law* | 27 |
| | | 2. | *Analysis* | 28 |
| | F. | *Evidentiary Claims (Claims IV and V)* | | 31 |
| | | 1. | *Clearly Established Law* | 32 |
| | | 2. | *Analysis* | 33 |
| | | | a. Silence | 33 |
| | | | b. Knife | 35 |
| | G. | *Recommendation Regarding Certificate of Appealability* | | 36 |
| | | 1. | *Legal Standard* | 36 |
| | | 2. | *Analysis* | 38 |
| | H. | *Conclusion* | | 39 |
| III. | NOTICE TO PARTIES REGARDING OBJECTIONS | | | 40 |

I.   <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.   <u>REPORT</u>:

A.   *Procedural and Factual Background*

Petitioner Carol Marie Ege, a state prisoner confined at the Huron Valley Women's Complex in Ypsilanti, Michigan, was twice convicted of first degree premeditated murder, MICH. COMP. LAWS § 750.316, in connection with the 1984 murder of Cindy Thompson. Petitioner was first charged in the Oakland County Circuit Court in April 1993, based in large part on bite mark evidence. She was tried in a 15-day trial over December 1993 and January 1994, and was found guilty as charged. The evidence presented at the first trial was summarized by the Sixth Circuit:

> Ege and Thompson had both been romantically involved with Mark Davis, whose child Thompson allegedly was carrying. Davis testified that he found Thompson in her upstairs bedroom some time before 5:00 a.m. on February 22, 1984, bludgeoned and stabbed to death, her organs laying beside her. There was no sign of forced entry at Thompson's home, and the back door was found unlocked. The phone cords had been cut. Thompson was last seen alive on the evening of February 21, sometime between 8:45 and 9:15 p.m. The initial police investigation, concluded in April 1984, yielded no definitive evidence. Eight years later, however, the investigation was reopened as a result of persons coming forward with evidence allegedly incriminating Ege. During the course of this reopened investigation, in 1992–1993, evidence that had been collected at the murder scene in February 1984 was submitted to the Michigan state crime lab for the first time. None of the evidence submitted to the crime lab connected Ege to the crime. The lab results yielded fingerprints of Davis and Thompson and hairs of Thompson and others, but no similar trace evidence connected to Ege. Thompson's body was exhumed in 1993, apparently to investigate a mark on her left cheek visible in photographs taken at the murder scene. The initial autopsy report had concluded that the mark was livor mortis. Ege was tried for murder following the 1992–1993 investigation.
> At trial, the prosecution attempted to show that Ege was obsessed with Davis and was therefore furiously jealous of Thompson and the child Thompson was carrying. The prosecution presented witnesses who testified that Ege and Thompson had argued several years prior to Thompson's death, when Ege entered Thompson's house to destroy a watch case and T-shirts that Thompson had bought for Davis. Further evidence was presented that Ege and Thompson engaged in a physical

struggle at Thompson's sister's house, when Thompson was five months pregnant. Witnesses also testified that Ege had attempted to hire two different men to kill Thompson, and that about one week before Thompson's death, Ege had asked her roommate, Carol Parker, to provide her with an alibi in exchange for free rent. Finally, several witnesses testified that Ege had expressed to them a desire to see Thompson killed. One witness testified that after Thompson became pregnant, Ege said to her, "Cindy [Thompson] was not going to have the baby; that she didn't know how or why, and she didn't want to get me involved, but that she wasn't going to have the baby." Another witness testified that Ege told her "she could stomp the baby out of her, slit her throat, rip her up in little pieces and think nothing of it." Yet another witness testified that Ege told him she wanted Thompson "really hurt bad, either beat her up bad or kill her."

Ege denied virtually all of the allegations made by prosecution witnesses, and much of their testimony was called into serious question on cross-examination, either through impeachment or showing of bias. The defense's theory of the case was that Ege could not have been at the crime scene on the evening of the murder because she was at home all evening, and that although there was perhaps some evidence pointing to her, a more compelling circumstantial case could in fact be made against several of the prosecution's witnesses, including Davis. Davis admitted that he had been drinking most of the day and night prior to Thompson's murder, and that by the time he decided to go to Thompson's house on the morning of February 22, he had consumed approximately five bottles of wine. Davis's presence at Thompson's house coincided approximately with the time she died. His alibi that he was drinking at a friend's house up until the time that he found Thompson's body was largely undermined by the friend's subsequent testimony that he and Davis were not in fact together that night. Also on cross-examination, Davis testified that he never believed that Ege had killed Thompson, and affirmed that Ege had in fact been home all night.

The prosecution's expert witness, Dr. Alan Warnick, opined that the mark found on Thompson's cheek, which the original autopsy report had concluded was liver mortis, was actually a bite mark. Dr. Warnick was unable to examine the actual injury, because Thompson's body was too badly decomposed upon exhumation nine years after the murder. Thus, Dr. Warnick relied on photographs of the mark which had been taken at the time of the initial autopsy, in 1984. Dr. Warnick compared dentitions of several suspects raised by the defense and found that none of them could have made the bite mark. He also checked Ege's dentition and concluded that it was highly consistent with the bite mark. Dr. Warnick was asked by the prosecution, "Let's say you have the Detroit Metropolitan Area, three, three and a half million people. Would anybody else within that kind of number match like she did?" He responded, "No, in my expert opinion, nobody else would match up." Ege's defense counsel did not object to Dr. Warnick's testimony, but rather called two expert witnesses in rebuttal. The first, a pathology professor at Wayne State University, concluded that the mark on Thompson's cheek was liver mortis, and not a bite mark. The second, a dentist and medical doctor, provided similar testimony, and added that even if it were a bite mark, the pattern did not align with Ege's

dentition.

*Ege v. Yukins*, 485 F.3d 364, 367-68 (6th Cir. 2007) (footnote omitted) (*Ege II*).

Following her trial and direct appeal, petitioner filed a motion for relief from judgment in the trial court, arguing that the admission of the bite mark testimony violated her right to a fair trial and that counsel was ineffective for failing to object. The trial court determined that the evidence had been improperly admitted, but that it was not sufficiently prejudicial to require a new trial. After her appeals were denied by the state appellate courts, petitioner filed an application for the writ of habeas corpus in this Court. On July 22, 2005, Judge Lawson conditionally granted the writ, concluding that petitioner had been denied a fair trial by the introduction of the bite mark evidence and that counsel had been ineffective for failing to object to that testimony. *See Ege v. Yukins*, 380 F. Supp. 2d 852 (E.D. Mich. 2005) (*Ege I*). The Sixth Circuit subsequently affirmed the conditional grant, over the dissent of Judge Boggs. *See Ege II, supra*.

Petitioner was retried in 2007, and was again convicted. This conviction is the basis for the instant habeas application. At the retrial, "the prosecution presented virtually the same evidence it had produced in 1992, with the exception of the bite mark evidence and the testimony of the witness who claimed defendant had threatened to 'stomp' the baby out of the victim and slit the victim's throat." *People v. Ege*, No. 284096, 2009 WL 2605410, at *2 (Mich. Ct. App. Aug. 25, 2009) (per curiam) (*Ege III*). The court of appeals more fully summarized the evidence as follows:

> Defendant shared a spot in a classic "love triangle" with Mark Davis and the victim. Defendant and Davis had known each other since childhood, and began living together in the early 1980's. Davis had also known the victim since childhood, but had not seen her for a considerable period of time before 1982. At some point that year, the victim visited the party store where Davis worked. Soon thereafter, Davis began dating the victim; Davis continued to live with defendant even after he had commenced a sexual relationship with the victim. By the end of 1982, defendant had learned of Davis's relationship with the victim, but continued to live with him.

4

In October 1982, the victim moved into an apartment complex in Oxford. Barbara Lambert, who described herself as the victim's "best friend," lived "kitty corner across the hall" from the victim. The apartment tenants were "very friendly," and often left their apartment doors open. On an unspecified date in December 1982, Lambert and the victim sat talking in Lambert's living room. Because Lambert's apartment door was open, Lambert heard "some commotion" coming from the direction of the victim's apartment. The victim and Lambert went into the victim's apartment and discovered "two females" inside. The two intruders "were ripping up t-shirts." The victim "started making quite a fuss, yelling." Lambert identified defendant as "possibly" one of the two female intruders, adding, "I don't know, it's been so many years." Lambert recalled that "[t]here was yelling and screaming back and forth," that the victim referred to one of the females as "Carol," and that "Carol" expressed that the victim would "never have Mark."

Deborah Dunn corroborated Lambert's testimony regarding the 1982 events in Oxford. Dunn identified herself as a friend of defendant, and testified that she and defendant drove to the victim's apartment because the victim "had gotten Mark some Christmas presents and Carol did not want him to have those, so she was taking them back." Dunn recalled that defendant walked into the victim's apartment and "started ripping up the t-shirts," and then smashed a watch case that the victim had given to Mark. Lambert described that the victim came in and yelled at defendant to leave, "there was some words exchanged," and she and defendant departed.

In approximately July 1983, the victim learned that she was pregnant. Davis never entertained any doubt that he was the baby's father, and expressed happiness about the pregnancy. He loved the victim, and planned to move in with her. Defendant learned of the victim's pregnancy a few months before the victim's murder.

In September 1983, defendant drove to a store with her friend, Sheryl Hooker. Defendant bought four bottles of wine and cigarettes for Davis.[2] Hooker recounted that defendant "was upset that Cindy was pregnant" and claimed to have asked Davis to suggest to the victim that she have an abortion. Defendant also offered that if the victim refused an abortion, defendant and Davis could adopt and raise the baby. During the same conversation, defendant expressed that "she didn't understand Cindy and why she wanted this baby so much, she goes she just makes me so mad I could kill her and she hit the steering wheel." Defendant also believed that the baby would be born "deformed."

> [2]Davis admitted that during the time of these events, he daily consumed a case of beer or five or six bottles of Boone's Farm wine, and smoked three or four marijuana cigarettes.

Several witnesses testified that on December 13, 1983, defendant physically assaulted the victim. At that time, the victim lived in a Waterford Township home with her older sister, Shirley Howells, and Howells's 14-year-old daughter, Kelly. During the late afternoon or early evening of December 13, 1983, the victim drove

Kelly to a store. After they left, Howells went down to her basement to talk on the telephone with a friend. She "heard a knock on the back door," and walked up the basement steps to see who was there. Howells observed a "blonde girl standing on my porch," whom Howells identified as defendant. Defendant asked for Cindy, and Howells related that Cindy was not at home but would return in about 20 minutes. Howells asked defendant who she was, and defendant replied that her name was Lisa. Howells then returned to the basement and completed her telephone call.

When Kelly and the victim returned from the store, the victim denied knowing anyone named Lisa. Howells recalled that she and the victim went into the basement, where Howells made another phone call to a friend named Ruthann. Howells again heard a knock on the back door, and asked her friend to hold. She and the victim went upstairs, and the victim identified the person at the door as "Carol Sanders."[3] Howells opened the door, advised defendant that the victim did not want to talk to her, and asked defendant to leave. According to Howells, defendant "stepped or tried to step into my door, she put both hands on my shoulders and forced her way inside." As Howells tried to push defendant out, "all of sudden out of the dark a man comes flying at me, grabs my arm and says get your hand off of her and let them talk." Defendant then "grabbed" the victim, and Howells heard "bumping and scuffling on the steps going down into the basement." The man instructed Howells and Kelly not to use the phone and to stay in the room. The victim yelled for Howells to call the police, and Howells responded that she could not make the call because the basement phone was off the hook. Howells described that she and the male intruder "both heard Cindy grab the phone or into the phone say Ruthann, call the police[.]" The man then shouted to defendant "let's get out of her[e] and she came up the stairs and the two of them went out the backdoor."

[3]In 1984, defendant's last name was Sanders.

The victim told Howells that while they were in the basement, defendant "wouldn't let go of her," so she "smack[ed]" defendant and grabbed the phone. A Waterford Township police officer arrived, obtained a report, and showed Howells that "there were cut wires just dangling" outside the house, apparently related to the cable television.

Richard Lingnau testified that he had accompanied defendant to Howells's home. Lingnau recounted that two months before the events in Waterford, defendant told him that "she wanted Cindy really hurt bad, either beat her up real bad or kill her." Defendant offered him two to three hundred dollars to accomplish this. On December 13, 1983, he went with defendant to Howells's home in Waterford. Lingnau intended to "kill Cindy," but fled when he realized that the victim was using the phone to call the police, and that other witnesses were present. Lingnau admitted on cross-examination that at the time of these events he drank 10 beers a day and had recently been released from confinement in a mental institution.

A Waterford Township police officer testified that on December 13, 1983, he responded to a dispatch and took a report indicating that there had been a

"pushing match" between defendant and the victim. Defendant was charged with assault and battery. At a hearing conducted a week after the victim's death, defendant pleaded guilty to trespassing and the prosecutor dismissed the assault and battery charges.

Hooker also corroborated the December 13, 1983 physical encounter between the victim and defendant. Hooker testified that on that date, the victim called and sounded "a little hyper, excited about what had just occurred," and related that "Carol had come to her door and had attacked her and her sister and restrained them, that the phone cords had been messed with, they had already had the police out there." Hooker recalled that during this conversation the victim described that she and defendant "had a tussle," and that defendant "tried to push her down the stairs."

Timothy Apker described himself as a friend of both defendant and Davis. He recalled that at a December 1983 party at the home of Nancy Davis, Mark Davis's mother, Nancy referred to the victim as "a scum bag," stated that "the baby was gonna be deformed," and expressed that she "wanted Cindy gone.... Murdered. Killed. Destroyed." At another party the next month, Nancy told Apker that defendant wished to speak with him. He and defendant drove to a Taco Bell, where defendant explained that Davis had gotten the victim pregnant, planned to move in with her, and that the baby would be deformed. Defendant also shared with Apker that she had "charges against her," and that she "hated" the victim. According to Apker, defendant offered him $350 to $500 or $1000 to kill the victim, and asked him to find someone to do it if he would not. Apker denied making any effort to find someone to kill the victim. He testified that defendant called him approximately three times to find out if he had located anyone. When he told her that he had not, defendant "made the comment that if it's going to be that way, if you can't find somebody, I'll do it myself." About eight days before the murder, defendant appeared at Apker's place of employment with Apker's ex-wife, Carol Deer, and the Apkers' young child, Tiffany. Defendant and Apker drove to Burger King, where defendant again asked Apker if he was interested in killing the victim or knew of anyone willing to do so.

Deer moved in with defendant and Davis in February 1984, after leaving her second husband. When defendant offered Deer a place to live, Deer suggested that she would pay rent. Defendant declined Deer's suggestion, stating, "I just want you to be my alibi." When Deer asked defendant what she was talking about, defendant related that Davis had gotten the victim pregnant "and she didn't want her to have the baby." Deer asked defendant "what she was gonna do," and defendant made a gesture with her hand, slashing her throat. Defendant also stated that she "was gonna have Cindy killed, she wanted her dead because the baby was gonna be deformed...." According to Deer, defendant also admitted that she and "Richard" had gone to the victim's sister's home "to try to cause her to lose the baby and that didn't work."

In early February 1984, the victim moved into a rented home located at 97 Seneca Street in Pontiac. On February 20, 1984, between 11:30 p.m. and midnight, Sheila Walker drove down Seneca on her way home from work. Walker recalled that a pickup truck had parked on the right side of Seneca with the driver's door open. A

car parked on the left side of Seneca, across from the pickup, blocked the street. Walker pulled her Cadillac behind the pickup, lit a cigarette, and rolled her windows part way down. Walker saw two people standing on the porch at 97 Seneca and heard a loud argument coming from the porch. One of the people on the porch was a tall skinny girl with long blonde hair, whom Walker subsequently identified as defendant. A female stood in the doorway of the house, and told the two people on the porch "to leave her alone." Walker testified that the blonde woman called the female in the doorway a "lying bitch," and yelled that "the baby wasn't his." The confrontation lasted between 10 and 15 minutes. It ended when a small red car pulled up behind Walker's car, and a woman emerged who ran onto the porch. The woman said, "let's go," and brought the blonde down the stairs. The blonde got into the small car and it drove away. The man left the scene in the pickup truck.

That same evening, the victim called Julie Thompson, the victim's sister-in-law, and reported that she had just had an argument with defendant and Troy Collings. Other testimony established that Collings lived with Nancy Davis and drove a pickup truck. The victim sounded "hysterical," and it took Thompson quite a while to calm her down. Although the victim was murdered two days later, Thompson did not tell the police about this conversation until 1992.

Shortly before 5:00 a.m. on February 22, 1984, Mark Davis found the victim's body in the upstairs bedroom of the home on Seneca. Dr. Ljuvisa Dragovic described that the victim had been bludgeoned about the head, probably causing her to lose consciousness. The wounds on the victim's head were consistent with impacts from the side of a ball-peen hammer. After the victim lost consciousness, the assailant slashed the victim multiple times on the neck and chest. One slash severed the victim's spinal cord, and the tip of the knife could have been bent while making this wound. One stab wound penetrated the victim's liver and the top of the uterus, ceasing the flow of oxygen to the victim's seven-month-old fetus. Dr. Dragovic estimated that the victim could have been killed between 9:00 p.m. on February 21, 1984 and 1:00 a.m. on February 22, 1984.

The police investigation yielded multiple fingerprints in the victim's bedroom belonging to Davis. None of the fingerprints found at the victim's home matched defendant. Other fingerprints found at the scene remained unidentified. No physical evidence connected anyone to the murder scene other than Davis. There was no indication of forced entry into the home, and Davis admitted to having a key. Two phone cords had been severed, including one in the victim's bedroom. Davis claimed that he had spent the evening at home drinking wine and smoking marijuana, and drove to the victim's home before 5:00 a.m. to retrieve some "pot" he had stored in her refrigerator.

Deer testified that on the morning after the murder, she called defendant at defendant's place of employment and informed her of the victim's death. That afternoon, Deer and defendant drove to the police station to answer questions. Deer quoted defendant as instructing her to "just tell them you don't know anything, because you don't," and that "Mark doesn't know anything either." A few days later, Apker anonymously contacted the Pontiac police department. A police officer

8

identified his voice, and persuaded him to engage defendant in a conversation while wearing a body wire. On April 3, 1984, Apker had lunch at a restaurant with defendant, Deer, and Tiffany, and the police recorded their discussion.

Three years later, in approximately 1987, Alfred Mallett called the police and told them that he possessed evidence that incriminated defendant. Mallett related that he and defendant had moved in together in 1984 or 1985. Although Mallett wanted to get married, defendant did not, apparently because she still cared for Davis. Defendant told Mallet that she had been a suspect in a homicide, and that she hated the victim. According to Mallett, defendant pointed out the home in Pontiac where the murder had occurred. Defendant denied involvement in the murder, and said that "if she ... ha[d] done it she would have dressed up like a Ninja and waited" at the victim's home. Defendant left Mallet because she started seeing someone else, and Davis helped her to move out. Mallet moved to Florida and put his belongings in storage.

Mallett returned to Michigan in 1987, and unpacked the items he had stored. In one of the boxes, he found a knife with a broken or bent tip that had what looked like "hair and blood and gristle" stuck to it. He put the knife in the dishwasher. Mallett thought that the knife might have been used in the victim's murder, so he called the police and arranged for them to obtain it. Testing of the knife failed to reveal any blood or foreign material. In 1992, Mallett provided the police with another box of items that he claimed had belonged to defendant. The box contained three hammers.

In 1993, the police reopened their investigation of the victim's murder. The victim's body was exhumed for additional examination, and all of the evidence gathered at the scene was tested for trace DNA evidence. The retesting yielded no additional information connecting defendant to the crime. On April 26, 1993, defendant consented to a taped interview with two Pontiac detectives, and the prosecution played the tape for the jury. During the police interview defendant denied any recall of the incident at the Oxford apartment involving the torn t-shirts, disputed that she "touch[ed]" the victim during the scuffle at Howells's home, and claimed that she lacked any knowledge of the victim's Pontiac residence.

Defendant did not testify at the trial. Throughout the proceedings, her counsel attempted to cast doubt on her guilt by establishing motives and opportunity for others to have killed the victim, particularly Davis, his mother, and Collings. The jury convicted defendant of first-degree murder after a nine-day trial.

*Ege III*, at *3-*8.

Following her trial petitioner, through counsel, filed an appeal of right in the Michigan Court of Appeals, raising five claims for relief:

I.   DEFENDANT'S MURDER CONVICTION MUST BE VACATED BECAUSE THE PROSECUTION PRESENTED CONSTITUTIONALLY

INSUFFICIENT CIRCUMSTANTIAL EVIDENCE THAT DEFENDANT WAS THE PERSON WHO COMMITTED THE MURDER.

II.     DEFENDANT WAS DENIED DUE PROCESS BY THE INTRODUCTION OF IDENTIFICATION TESTIMONY BASED ON AN UNNECESSARILY SUGGESTIVE PHOTOGRAPHIC LINEUP WHICH INCLUDED A NON-STANDARD PHOTOGRAPH WHICH THE WITNESS HAD SEEN AND SELECTED FROM A CIVILIAN PHOTO SHOW-UP EIGHT YEARS EARLIER.

III.    THE TRIAL COURT'S REFUSAL TO ALLOW THE DEFENDANT TO PRESENT EVIDENCE OF THIRD PARTY GUILT CONSTITUTED A DENIAL OF HER CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE.

IV.     THE COURT DENIED DEFENDANT DUE PROCESS WHEN IT ERRONEOUSLY ADMITTED AS AN ADOPTIVE ADMISSION OR AS EVIDENCE OF CONSCIOUSNESS OF GUILTY TESTIMONY THAT DEFENDANT ASKED A WITNESS TO KILL CINDY THOMPSON.

V.      THE COURT ABUSED ITS DISCRETION AND DENIED DEFENDANT A FAIR TRIAL WHEN IT ADMITTED EVIDENCE ABOUT A BLOODY KNIFE WHERE THERE WAS NO NEXUS BETWEEN THAT KNIFE AND THE STABBING DEATH IN THIS CASE.

The court of appeals found no merit to petitioner's claims, and affirmed her conviction and sentence. *See Ege III*, *supra*.  The Michigan Supreme Court subsequently denied petitioner's application for leave to appeal raising these issues in a standard order.  *See People v. Ege*, 485 Mich. 1119, 779 N.W.2d 255 (2010).

On February 11, 2011, petitioner filed the instant application for the writ of habeas corpus pursuant to 28 U.S.C. § 2254.  As grounds for the writ, she raises the five claims that she raised in the state courts.  Respondent filed her answer on August 25, 2011.  She contends that petitioner's claims are without merit, and with respect to petitioner's identification and evidentiary claims she additionally contends that if there was error, it was harmless.

B.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, her petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Because each of petitioner's claims was "adjudicated on the merits" by the Michigan Court of Appeals, § 2254(d) is applicable here.

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*,

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v.*

12

*Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

C.    *Sufficiency of the Evidence (Claim I)*

Petitioner first contends that the prosecution presented insufficient evidence to prove her guilt beyond a reasonable doubt.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution.  "[I]t is the responsibility of the jury–not the court–to decide what conclusions should be drawn from the evidence admitted at trial."  *Cavazos v. Smith*, 565 U.S. 1, ___, 132 S. Ct. 2, 4 (2011) (per curiam).  The *Jackson* standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319).  Likewise, a reviewing court "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United State v. Owusu*, 199

13

F.3d 329, 344 (6th Cir. 2000); *see also*, *United States v. Bailey*, 444 U.S. 394, 424-25 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326. As the Court has explained, "the only question under *Jackson* is whether [the jury's finding] was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. As the Sixth Circuit observe, "the *Jackson v. Virginia* standard is so demanded that a defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle." *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (en banc) (internal quotation omitted). Under the amended version of § 2254(d)(1) a federal habeas court's review is "twice-deferential." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam). A state court's decision that the evidence satisfied the deferential *Jackson* standard is itself "entitled to considerable deference under AEDPA." *Coleman*, 132 S. Ct. at 2065; *see also*, *Cavazos*, 132 S. Ct. at 4; *Davis*, 658 F.3d at 534 ("Adding to this extremely high bar [under *Jackson*] are the stringent and limiting standards of AEDPA.").

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is

14

purely a matter of federal law." *Coleman*, 132 S. Ct. at 2064 (citation omitted) (quoting *Jackson*, 443 U.S. at 324 n.16).

    2.    *Analysis*

After reviewing the evidence presented at petitioner's trial, *see Ege III*, at *3-*8, and setting forth the correct legal standard, *see id.* at *3, the Michigan Court of Appeals rejected petitioner's claim, reasoning:

> The circumstantial evidence supporting defendant's identity as the perpetrator proved defendant's (1) motive, (2) previous threats to kill the victim, (3) prior acts of aggression toward the victim, and (4) possession of weapons that she could have used to commit the murder. In combination, this evidence constituted a sufficient basis from which a rational jury could conclude, on the basis of reasonable inferences and beyond a reasonable doubt, that defendant murdered the victim. The prosecution established that defendant possessed several motives to kill the victim. Defendant expressed hatred of the victim because of the victim's relationship with and impregnation by Davis. Furthermore, defendant was charged with assaulting and battering the victim, and was scheduled to appear in district court a week after the victim's murder. An accused's motive bears on her identity as the perpetrator of the offense. *People v. Flynn*, 93 Mich.App. 713, 722, 287 N.W.2d 329 (1979). "In cases in which the proofs are circumstantial, evidence of motive is particularly relevant." *People v. Unger*, 278 Mich.App. 210, 223, 749 N.W.2d 272 (2008).
>
> Abundant evidence also established that defendant had threatened to kill the victim. Hooker related that in September 1983, defendant expressed that the victim "just makes me so mad I could kill her[.]" Apker recounted defendant's assertion that if he refused to kill the victim, "I'll do it myself." Apker's testimony established that defendant had solicited him to kill the victim, further evidencing defendant's motive and intent. Defendant also asked Deer to supply an alibi during the same conversation in which she indicated with a gesture that she intended to slash the victim's throat. Evidence of a defendant's prior threats against a victim qualify as "highly probative" evidence of motive and identity. *People v. Armentero*, 148 Mich.App. 120, 133, 384 N.W.2d 98 (1986); *see also People v. Milton*, 186 Mich.App. 574, 577, 465 N.W.2d 371 (1990), remanded on other grounds 438 Mich. 852, 473 N.W.2d 310 (1991).
>
> On three separate occasions, defendant appeared at the victim's residence and behaved in an aggressive manner. In 1982, defendant entered the victim's apartment without permission and destroyed some personal property. On December 13, 1983, defendant physically assaulted the victim in Howells's home. Two days before the murder, defendant confronted the victim on the victim's porch and argued loudly with her. These acts permit reasonable inferences that defendant possessed an

opportunity to kill the victim, knew where the victim lived, and harbored an intent to harm the victim. *People v. Morris*, 139 Mich.App. 550, 557, 362 N.W.2d 830 (1984). *See also People v. Orr*, 275 Mich.App. 587, 592, 739 N.W.2d 385 (2007), citing *Morris*, *id.*, for the proposition that "evidence of prior assaults of a victim is probative of the issue of intent in a later-charged murder of the same victim and, therefore, is not unduly prejudicial."

Mallett's testimony regarding the knife with the bent tip and the "hair and blood and gristle" also supported a rational inference that defendant killed the victim. The jury possessed the prerogative whether to credit Mallett's explanation regarding his discovery of the knife and his decision to put the knife in the dishwasher, despite the alleged incredibility of Mallett's account. *People v. Lemmon*, 456 Mich. 625, 642, 576 N.W.2d 129 (1998).

The facts in this case thus give rise to a series of reasonable inferences of defendant's identity as the murderer, flowing from defendant's motive, expressed intent, and opportunity to kill the victim. Reasonable inferences arising from the evidence permit a rational conclusion beyond a reasonable doubt that defendant hated the victim enough to kill her, intended to kill the victim, had the opportunity to kill the victim, and owned a weapon that she could have used to kill the victim. Although each link in the prosecution's chain of proof against defendant is circumstantial, the conjoined inferences flowing from the evidence are neither speculative nor irrational, and therefore permit a jury to reasonably conclude beyond a reasonable doubt that defendant committed the murder. The jury rejected the notion that anyone else killed the victim, despite evidence strongly suggesting that a third party may have committed the crime; "[a] rational jury might well have acquitted without violating its oath; but, drawing all reasonable inferences in favor of the prosecution, a rational jury could also convict." *Stewart v. Coalter*, 48 F.3d 610, 616 (C.A.1, 1995).

*Ege III*, at *8-*9. This determination was reasonable.

Petitioner does not challenge the sufficiency of the evidence with respect to any particular element of the crime. Rather, she contends that the evidence was insufficient to prove beyond a reasonable doubt that she was the killer. She argues that the circumstantial evidence created only a suspicion that she murdered the victim, but did not provide proof beyond a reasonable doubt. She also argues that the evidence was equally compelling that someone else, such as Mark Davis or his mother, killed the victim. As noted above, the question is not how this Court would weigh the evidence or what this Court would have concluded had it sat as the trier of fact. The only question

16

under *Jackson* is whether the jury's verdict was "so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. And the only question on habeas review is whether the Michigan Court of Appeals's determination that the verdict did not fall below this threshold was reasonable. The Court should conclude that it was.

Here, there was a strong circumstantial case that petitioner committed the killing. The prosecution presented abundant evidence that petitioner had a motive to kill the victim, and that she both threatened to do so and had attempted to hire someone to kill the victim. There was also evidence that petitioner had several confrontations with the victim, including one shortly before the murder. Further, Mallett testified that he found a knife with blood and hair on it in a box of petitioner's possessions, and the medical examiner testified that the bent tip on the knife was consistent with the damage the murder weapon might have received by being driven through the victim's vertebrae. This evidence, taken together, provided sufficient evidence to prove petitioner's guilt beyond a reasonable doubt. *See Mykolaitis v. Howes*, No. 2:10-CV-11903, 2011 WL 3624949, at * (June 28, 2011) (Komives, M.J.) (citing *Rothgeb v. United States*, 789 F.2d 647, 648-50 (8th Cir. 1986); *Mishall v. Warren*, No. 07-14080, 2009 WL 3818174, at *5-*6 (E.D. Mich. Nov.13, 2009) (Luddington, J.); *United States v. Schlesinger*, 372 F. Supp. 2d 711, 723–24 (E.D.N.Y. 2005), *aff'd*, 261 Fed. Appx. 355, 359 (2d Cir. 2008)) ("[E]vidence of motive, means, opportunity, and consciousness of guilt was sufficient to prove beyond a reasonable doubt that petitioner killed Sanders."), *magistrate judge's report adopted*, 2011 WL 3624946 (E.D. Mich. Aug. 16, 2011) (Steeh, J.); *see also*, *Flieger v. Delo*, 16 F.3d 878, 883-84 (8th Cir. 1992); *Jennings v. Grizzard*, 793 F. Supp. 681, 684 (W.D. Va. 1991).

"It is well-established that circumstantial evidence alone can be sufficient to support any

burden of proof, even where, as in a matter of substantive criminal liability, the prosecution's proof must be beyond a reasonable doubt." *United States v. Jones*, 31 F.3d 1304, 1316 (4th Cir. 1994); *see also*, *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984). "[C]ircumstantial evidence is intrinsically as probative as direct evidence even where the conviction rests solely upon circumstantial evidence." *United States v. Taylor*, 599 F.2d 832, 838 (8th Cir. 1979) (citing *Holland v. United States*, 348 U.S. 121 (1954)). As the Supreme Court explained in *Holland*:

> Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

*Holland*, 348 U.S. at 140. Likewise, the evidence is not rendered insufficient because there was no forensic evidence tying petitioner to the crime. "Lack of physical evidence does not render the evidence that is presented insufficient." *United States v. Magallanez*, 408 F.3d 672, 681 (10th Cir.2005); *see also*, *O'Hara v. Brigano*, 499 F. 3d 492, 500 (6th Cir. 2007) (victim's testimony alone sufficient even though not corroborated by other witnesses or physical evidence); *United States v. Bieghler*, 198 Fed. Appx. 566, 568 (8th Cir. 2006) ("'[F]orensic evidence' is not required for conviction.").

To be sure, petitioner argues that some of the prosecution's evidence, particularly Mallett's testimony regarding the knife, was not credible, and that the evidence equally pointed to other potential killers. Neither of these arguments calls into question the sufficiency of the evidence. As the Supreme Court explained, the *Jackson* standard does not permit "fine-grained factual parsing" of the evidence by a reviewing court, *Coleman*, 132 S. Ct. at 2064, nor does it permit this Court to reweigh the conflicts in the evidence or assess the credibility of the witnesses. The trier of fact was

free to draw any reasonable inferences from the evidence, and to resolve the conflicts in the evidence in favor of the prosecution. Further, that the evidence might equally support other, innocent, inferences is irrelevant; the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient. *See Jackson*, 443 U.S. at 326. This rule applies equally where the prosecution's case is based solely or principally on circumstantial evidence. *See United States v. Ramirez*, 635 F.3d 249, 256 (6th Cir. 2011); *United States v. Ellerbee*, 73 F.3d 105, 107 & n.2 (6th Cir. 1996).

In short, although there was no direct evidence tying petitioner to the crime, it cannot be said that the jury's verdict based on the circumstantial evidence was "so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. And it certainly cannot be said that the Michigan Court of Appeals's conclusion that the evidence presented met the deferential *Jackson* standard was itself unreasonable. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

D.    *Suggestive Identification (Claim II)*

Petitioner next contends that Walker's identification of her as the person arguing with the victim on the victim's porch two days before the murder was the result of an impermissibly suggestive identification procedure. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

A pre-trial identification procedure violates the Constitution if "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967).

19

Similarly, a subsequent in-court identification following an impermissibly suggestive pre-trial identification is unconstitutional if the pre-trial "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).  *See generally*, *Neil v. Biggers*, 409 U.S. 188, 197-98 (1972).  A suggestive line-up alone, however, does nor require exclusion of identification evidence. "The admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977).  Thus, the central question in a case where the pre-trial identification procedure is impermissibly suggestive is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199; *accord Manson*, 432 U.S. at 114.  The factors relevant to this "totality of the circumstances" analysis include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200; *accord Manson*, 432 U.S. at 114.  Thus, a court must "follow[] a two-step analysis in determining whether an identification is admissible." *United States v. Crozier*, 259 F.3d 503, 510 (6th Cir. 2001).  First, the court must "consider whether the identification procedure was suggestive." *Id.* If it was not, the "identification testimony is generally admissible without further inquiry," and any question as to the reliability of the identification "goes to the weight of the evidence, not its admissibility." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990).  If, on the other hand, the procedure was suggestive, the court must "then determine whether, under the totality

of the circumstances, the identification was nonetheless reliable and therefore admissible." *Crozier*, 259 F.3d at 510.

2.   *Analysis*

Prior to trial, Walker twice identified petitioner in a photo array as the person arguing with the victim two days before the murder: once in April 1984, and again in 1992.  The circumstances regarding the identifications were summarized by the Michigan Court of Appeals:

> Two days before the murder, Walker saw and heard three people arguing on the victim's front porch. Walker first disclosed her knowledge of the argument in April 1984, when she spoke with a friend named Deborah Woodward. Woodward knew both the victim and Sheryl Hooker. Shortly after the victim's death, Walker told Woodward about the events on the porch, and Woodward told Hooker. In April 1984, Hooker met with Walker and showed her seven photographs. The photos depicted (1) "Mark Davis sitting in his van," (2) Nancy Davis, (3) Dave Hooker, Sheryl Hooker's husband, Mark Davis, and defendant sitting in the background at a picnic table, (4) defendant sitting in a beanbag chair, "playing with her hair," (5) Carol Deer, (6) another photo of Deer, and (7) Mark Davis with a friend named Jeff Bostwick. The parties have not supplied this Court with any of the photos apart from the photo of defendant sitting in a beanbag chair.
>
> Hooker recalled that she showed the photos to Walker and asked her if anyone looked familiar. Walker selected the photo of defendant sitting in the beanbag chair and one of the photos of Davis. Walker expressed certainty that defendant was the woman who had been on the victim's front porch, but with respect to Davis, Walker commented, "I believe this guy looks similar, but I can't be sure." Walker did not select the second photo of defendant included in the array. Hooker claimed that she told the police about her detective work in 1984.
>
> In 1992, Pontiac detective Jane McLaurin Walter met with Sheila Walker. Detective Walter showed Walker an array of 30 to 50 photos that included the same seven photos used by Hooker in 1984. Walker picked three photos, including defendant in the beanbag chair, the photo of Davis sitting in his van, and a photo of a woman named Kerry Thompson, who Walker "thought was the person that came in a little sports car and took ... the other ... female away." Detective Walter recalled that Walker felt certain that defendant was the woman from the victim's front porch, and that Walker "believed [Davis] ... was the guy that was on the porch." Walker never identified defendant in the courtroom.
>
> Before defendant's first trial commenced in December 1993, the trial court conducted a Wade hearing. United States v. Wade, 388 U.S. 218, 227, 240-241, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). At the conclusion of the hearing, the trial court ruled as follows:

> I have had a chance to listen to the testimony and review People's Exhibit No. 1, which contains the totality of the array pictures. And although it's true that the one picture of Carol Ege shows that she appears to be a tall person, at least from the photo, however, I don't think she's a tall person in person, just my observing her, and that her hair appears to be long. When you-this was part of a hodgepodge of pictures of which there are several females who were blonde, some of whom ... had long hair, and there appears to have been no suggestion or no intent on the officers' part to place that picture in a position so that it would stand out from all the others. Although it is somewhat different, I cannot say based on my review of the totality of pictures-and there was more than 10.... This Court cannot conclude as a matter of law or fact that the pretrial identification procedure was so suggestive in light of the totality of circumstances, that it led to a substantial likelihood of misidentification.

*Ege III*, at *10. Prior to petitioner's second trial, the trial court reaffirmed its earlier ruling regarding the identifications made by Walker.  *See id*. at *11.

The Michigan Court of Appeals rejected petitioner's claim.  "[A]ssum[ing] without deciding that a due process analysis applies to [Hooker's] civilian-conducted photo display," *id*. at *12, the court concluded that because the parties had not provided all of the pictures used by Hooker, it was "impossible . . . to conclude that the 1984 photo display was unduly suggestive," because there was no evidence that petitioner "looked distinctively different from the other two women who appeared in the photos, or that any qualities of the photos specifically suggested [petitioner] or singled her out in some manner."  *Id*.  Further, the court reasoned that even if the photographs were unduly suggestive, petitioner "failed to show under the totality of the circumstances any suggestiveness resulted in a misidentification."  *Id*.  The court reasoned that Walker testified that she observed the confrontation for 10-15 minutes, was able to describe the features of the woman she identified as petitioner, and petitioner walked right beside Walker's car.  *See id*.  Because of Walker's opportunity to view petitioner, the short time between the confrontation and Walker's identification,

and the correlation between Walker's description of the woman and petitioner's features, "a sufficiently reliable basis existed for Walker's 1984 identification of defendant." The court of appeals also concluded that Walker's subsequent 1992 identification was "independently reliable." *See id*. at *13. The Court should conclude that this determination was reasonable.

With respect to Walker's first identification, petitioner cannot show a due process violation because that identification was the result solely of an identification procedure conducted by an individual, not by the police. In *Perry v. New Hampshire*, 132 S. Ct. 716 (2012), the Court recently explained that the dangers of identification testimony are ordinarily to be combated by the safeguards inherent in the criminal justice system, including the rights of counsel, compulsory process and confrontation, and that reliability is determined by the finder of fact. A pretrial determination of reliability by the court is required only where the identification results from impermissibly suggestive pretrial procedures *arranged by the police*. *See id*. at 721 & n.1, 724-28, 730. Specifically, the Court held:

> When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

*Id*. at 721. Here, petitioner does not allege that there was any "improper law enforcement activity . . . . involved" in Walker's initial identification as a result of the photographic "line up" conducted by Hooker, a private party.

With respect to the subsequent photographic lineup conducted by the police, the Michigan Court of Appeals determined that petitioner had failed to establish that the lineup was impermissibly suggestive, and this determinations was reasonable. The officer who conducted the lineup testified

that there were 55 pictures presented to Walker, and the pictures were presented at the hearing on petitioner's motion to suppress the identification prior to the first trial.  *See* Hr'g Tr., dated 9/29/93, at 80-81 (attached as Exhibit B to petitioner's habeas application).  The photographs included about 12-13 pictures of women with blonde hair.  *See id.* at 85.  The trial judge who heard the matter and viewed the photographs determined that the photo array was not impermissibly suggestive:

> When you – this was part of a hodgepodge of pictures of which there are several females who were blonde, some of whom had long hair, and there appears to have been no suggestion or intent on the officers' part to place that picture in a position so that it would stand out from all the others.  Although it is somewhat different, I cannot say based on my review of the totality of pictures . . . as a matter of law or fact that the pretrial identification procedure was so suggestive in light of the totality of circumstances, that it led to a substantial likelihood of misidentification.

*Id.* at 105.  Petitioner has pointed to no evidence to rebut this conclusion.  A line-up is impermissibly suggestive if "the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection."  *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001).  Thus, a line-up is impermissibly suggestive where it "emphasizes the focus on a single individual thereby increasing the likelihood of misidentification."  *United States v. Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998) (internal quotation omitted); *see also*, *United States v. Wong*, 40 F.3d 1347, 1359-60 (2d Cir. 1994); *Griffin v. Rose*, 546 F. Supp. 932, 936 (E.D. Tenn. 1981), *aff'd*, 703 F.2d 561 (6th Cir. 1982).  In short, an identification procedure is suggestive only if it "directs undue attention to a particular" person.  *State v. Ramires*, 37 P.3d 343, 350 (Wash. Ct. App. 2002).  Thus, a photographic array is impermissibly suggestive if "the picture of the accused, matching descriptions given by the witness, so stands out from all of the other photographs as to suggest to an identifying witness that that person was more likely to be the culprit."  *United States v. Thai*, 29 F.3d 785, 808 (2d Cir. 1994) (internal quotation omitted).  Petitioner has offered nothing to rebut the trial court's

24

initial conclusion and the Michigan Court of Appeals's subsequent determination that nothing in the composition of the array made her picture stand out to Walker. Thus, the Michigan Court of Appeals was reasonable in concluding that the procedure was not impermissibly suggestive.

The Michigan Court of Appeals also determined that, even if the procedure employed was impermissibly suggestive, Walker's identification was nonetheless sufficiently reliable that it was admissible. This determination, too, was reasonable. As noted above, even where an pretrial identification results from a suggestive procedure, the identification is nonetheless admissible if "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil*, 409 U.S. at 199. In assessing the totality of the circumstances, a court should consider all relevant factors, including: "(1) the opportunity of the witness to view the defendant at the initial observation; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; (4) the level of certainty shown by the witness at the pretrial identification; and (5) the length of time between the initial observation and the identification." *Howard v. Bouchard*, 405 F.3d 459, 472 (6th Cir. 2005) (citing *Manson*, 432 U.S. at 114; *Neil*, 409 U.S. at 199-200). The Michigan Court of Appeals considered each of these factors, and concluded that the identification was reliable because Walker had a good opportunity to view petitioner for 10-15 minutes, her description of the woman on the porch correlated with petitioner's physical features, and Walker was "very sure" of her identification. *See Ege III*, at *13. *Neil* establishes a general, open-ended test, and thus this Court's review is "especially deferential." *Rock v. Conway*, 470 Fed. Appx. 15, 17 (2d Cir. 2012); *see also*, *Tilmon v. Warden Winn Correctional Ctr.*, No. 05-2170, 2009 WL 720886, at *6 (W.D. La. Mar. 16, 2009); *Hayes v. Konteh*, No. 3:05CV2958, 2008 WL 596097, at *9 (N.D. Ohio Mar. 4, 2008). *See generally*, *Yarborough*

*v. Alvarado*, 541 U.S. 652, 664 ("The more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations."). Petitioner has offered nothing to show that the Michigan Court of Appeals's application of this test was unreasonable.

Further, any error in admitting Walker's second identification was harmless. *See Marsden v. Moore*, 847 F.2d 1536, 1546 (11th Cir. 1988) ("Unreliable identifications resulting from unduly suggestive photographic displays are subject to harmless error analysis."); *see also*, *United States v. Washington*, 353 F.3d 42, 45 (D.C. Cir. 2004). Even assuming that a constitutional error occurred in the admission of Walker's second identification, petitioner is entitled to habeas relief only if the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also*, *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (explaining that *Brecht* harmless error standard applies on habeas review regardless of whether or under what standard the state court conducted harmless error review).[1] Here, the admission of Walker's second identification did not have a substantial and injurious effect or influence on the jury's verdict, for several reasons. First, it was cumulative of Walker's first identification which, as explained above, raises no constitutional issue. Second, it went to a collateral matter–Walker did not identify petitioner as the perpetrator, but only as the person arguing with the victim two days before the murder. Third, there was significant other evidence of petitioner's confrontations with the victim, including one that resulted in charges being brought against her, as well as evidence that petitioner wanted to hire someone to kill the victim. In these circumstances, the admission of Walker's second identification, even if

---

[1]Respondent explicitly argues in her answer that the error was harmless. *See* Answer, at 70-71. Thus, this is not a case in which the Court must decide whether to consider the matter *sua sponte*. *See Gover v. Perry*, ___ F.3d ___, ___, 2012 WL 5200193, at *3-*5 (6th Cir. Oct. 23, 2012).

erroneous, was harmless.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.     *Right to Present a Defense (Claim III)*

Petitioner next contends that she was denied her constitutional right to present a defense by the trial court's evidentiary ruling excluding testimony relevant to her defense.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.     *Clearly Established Law*

Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law.  Implicit in these provisions is the right to present a meaningful defense.  As the Supreme Court has recognized, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  "The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact.  The right to offer testimony is thus grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  Further, the Court has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408.  Although the right to present a defense is fundamental, it is not absolute.  Thus, the right must yield to other constitutional rights, *see e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment right of an accused to compulsory process to secure attendance of a witness

27

does not include the right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

Further, to constitute a denial of the right to present a defense, a trial court's exclusion of evidence must "infringe[] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308. A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315). Thus, "'[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting court).

### 2.   *Analysis*

Petitioner argues that she was denied her constitutional right to present a defense by the trial court's ruling that her counsel could not question Kim Clarke, Mark Davis's sister, about Davis's acts of anger and violence, and in particular his beating of Clarke several years prior to the murder. The court of appeals explained the evidence petitioner sought to introduce:

> In a separate record documenting the excluded testimony, Clarke testified that in 1979, Davis "came into my mother's house looking for something and I had asked him what it was he was looking for and he got really volatile and hit me several times." Clarke estimated that Davis hit her 10 or 12 times, breaking a tooth and causing blood to appear in her eye. She believed that Davis had "explosive anger issues over things that didn't really require you to react that way. I mean, it would be really super strong reactions to something silly that might irritate you." Clarke alleged that Davis also suffered from alcohol-induced blackouts. The trial court

28

excluded this testimony, ruling that it described events too remote in time to the murder.

*Ege III*, at \*14. The court of appeals rejected petitioner's claim, concluding that the trial court properly excluded the evidence of Davis's prior acts under Rule 404(b) because the assault on Clarke was remote in time and because the evidence was not offered for a proper purpose, but to show Davis's propensity. *See id.* The court also reasoned that "the exclusion of Clarke's testimony did not preclude [petitioner] from introducing evidence regarding Davis's guilt," noting that "throughout trial, defense counsel attempted to implicate Davis and others." *Id.* Thus, the court concluded, "[t]he exclusion of Clarke's otherwise inadmissible testimony about Davis did not deprive [petitioner] of a meaningful opportunity to present a complete defense." *Id.* This determination was reasonable.

Petitioner makes no argument that the evidence was, in fact admissible under Rule 404(b), and in fact concedes that the only purpose of the evidence was to show Davis's "proclivity for violence," Pet., Attachment A, at 11, to show that he "act[ed] in conformity therewith," MICH. R. EVID. 404(b)(1). And there is likewise no doubt that petitioner's right to present a defense does not relieve her from her obligation to comply with the rules of evidence, *see Clark v. Arizona*, 126 S. Ct. 2709, 2731-32 (2006); *Scheffer*, 523 U.S. at 308. It is true that the Court has held that state evidence rules may not be applied mechanistically so as to prevent a defendant from presenting evidence fundamental to his defense. *See Chambers*, 410 U.S. at 302, 313. However, *Chambers* and its progeny "do not stand for the proposition that a petitioner's due process rights are violated any time a state court excludes evidence that the petitioner believes is the centerpiece of his defense. Instead, the cases . . . stand for the more limited proposition that a defendant's due process rights are violated when a state court excludes important evidence on the basis of an arbitrary, mechanistic,

or per se rule, or one that is disproportionate to the purposes it is designed to serve." *Alley v. Bell*, 307 F.3d 380, 394 (6th Cir. 2002). In other words, application of the rules of evidence constitute a denial of the right to present a defense only where it "significantly undermine[s] fundamental elements of the accused's defense," *Scheffer*, 523 U.S. at 315–that is, where the application of the evidentiary rules "infringe[s] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

Here, petitioner cannot show that the exclusion of this testimony undermined a fundamental element of her defense. Notwithstanding the absence of this testimony, petitioner presented significant evidence pointing toward either Davis or Davis's mother as the killer. Indeed, the evidence establishing a motive and opportunity for these two alternate suspects was so extensive that counsel's summary of that evidence during closing argument covers 26 transcript pages. *See* Trial Tr., dated 11/5/07, at 98-124. That evidence included testimony concerning: (1) Nancy Davis's expressions that she wanted the victim dead; (2) Nancy Davis's aggressive nature; (3) Nancy Davis's motive, including her belief that the victim had had an affair with her dead husband, was having an affair with her current boyfriend, and her anger over the pregnancy; (4) Nancy Davis's, rather than petitioner's, presence on the porch during the confrontation with the victim; (5) Nancy Davis's flight to Florida after the murder; (6) the absence of an alibi for Nancy Davis; (7) Mark Davis's motive, including his desire for the victim to have an abortion, which she refused to do; (8) the force with which the murder was accomplished, suggesting that it was done by a man; (9) Mark Davis's drinking and drug problems, which caused him to have explosive rage and suffer blackouts; (10) Mark Davis's lies to the police; (11) the fact that Mark Davis was the only person known for sure to be at the scene; (12) the fact that there was no forced entry and Mark Davis had a key; and (13) Mark Davis's possession of a knife on the night of the murder. *See id*. As this review of the

30

evidence shows, petitioner was far from precluded in presenting her defense by the trial court's exclusion of a prior incident in which Mark Davis assaulted his sister. This incident was offered solely as propensity evidence to establish his violent aggression, and did not directly bear on the facts of the crime itself. This point was demonstrated by other evidence presented at trial, and as set forth above there was abundant evidence presented by petitioner that both Mark Davis and his mother Nancy had a stronger motive and better opportunity to have committed the crime. In light of the collateral nature of the Rule 404(b) evidence and the extensive other evidence of third party guilt presented by petitioner but rejected by the jury, it cannot be said that "'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *Blackwell*, 459 F.3d at 753 (quoting *Washington*, 255 F.3d at 47) (alterations by quoting court); *see Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (petitioner not denied right to present a defense by trial court's exclusion of Rule 404(b) evidence where petitioner was able to introduce "considerable non-propensity-based evidence in support of the Peckham-did-it defense."); *United States v. Lucas*, 357 F.3d 599, 606-07 (6th Cir. 2004) (exclusion of third party's prior conviction did not violated defendant's right to present a defense where defendant " was able to explore her theory that [another individual] was in fact the culprit" through other evidence.). Thus, the Michigan Court of Appeals's determination that the trial court's evidentiary ruling did not deprive petitioner of her right to present a defense was reasonable, and petitioner is not entitled to habeas relief on this claim.

F.    *Evidentiary Claims (Claims IV and V)*

Finally, petitioner contends that she was denied a fair trial by the introduction of inadmissible testimony. In Claim IV, she contends that she was denied a fair trial by the introduction of her silence as an adoptive admission or as showing her consciousness of guilt. In

Claim V, she contends that she was denied a fair trial by the introduction of the knife found by Mallett. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

      1.    *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws."). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v.*

*Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

      2.    *Analysis*

*a. Silence*

Petitioner contends that she was denied a fair trial by the introduction of a tape recorded conversation between Apker and Carol Deer, at which she was present. As summarized by the Michigan Court of Appeals:

> Defendant challenges the admission of the following portion of Apker's tape-recorded conversation with her:
> *Apker*: Do you remember when you guys called me and all this other shit, right?
> *Carol Deer*: Mm-hmm.
> *Apker*: Okay. Let me ask you this. When you know that Carol wanted me to-
> *Carol Deer*: Mm-hmm.
> *Apker*:-kill Cindy, right?
> *Carol Deer*: Mm-hmm.
> *Tiffany Apker*: (Unintelligible).
> *Apker*: Did you use Tiffany-
> *Carol Deer*: No.
> *Apker*: Why did-Okay but let me ask you this. Then why did you send her my way?
> Defendant moved to bar the admission of this exchange, contending that she had no involvement in the conversation between Apker and Deer. The trial court determined that the statement's admissibility would depend on the foundation laid at trial. Apker testified on a separate record that the conversation took place at a round table, and that Tiffany sat to Apker's immediate right, while defendant sat to his immediate left. Deer sat across the table from Apker. The trial court then permitted the prosecution to introduce the quoted segment of the tape, and to argue that defendant's silence during this conversation evidenced her guilt.

33

*Ege III*, at \*14-\*15.  The court of appeals concluded that the trial court erred in admitting this evidence as an adoptive admission, but that the error was harmless in light of the other evidence against petitioner, including other evidence that petitioner had solicited someone to kill the victim. *See id*. at \*16.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

The Michigan Court of Appeals concluded that this evidence was improperly admitted, but that alone is not sufficient to entitle petitioner to relief.[2]  As explained above, petitioner is entitled to habeas relief only if this evidence was so unreliable that its admission deprived her of a fair trial. Petitioner cannot make that showing here.  Although the prosecutor was permitted to argue that petitioner's silence indicated a consciousness of guilt, this was a weak argument unlikely to be accepted by the jury in light of the fact that during other portions of this same conversation petitioner adamantly denied having anything to do with the murder.  The entire tape of the conversation was played for the jury, and the jury was provided with written transcripts.  *See* Trial

---

[2]Respondent contends that the court of appeals erred in concluding that this evidence was not admissible under state law.  *See* Answer, at 84 n.30.  Contrary to respondent's argument, however, this Court is bound by the Michigan Court of Appeals's determination of that issue.  It is true, as respondent notes, that a court "should not apply AEDPA deference to [a] state court's pro-petitioner resolution of [an] issue because AEDPA's standard of review is 'a precondition to the grant of habeas relief ("a writ of habeas corpus . . . shall not be granted" unless the conditions of § 2254(d) are met), not an entitlement to it.'"  *Daniels v. Lafler*, 501 F.3d 735, 740 (6th Cir. 2007) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (in turn quoting 28 U.S.C. § 2254(d)).  The *Daniels* court, however, was speaking to a state court's pro-petitioner resolution of a federal constitutional issue.  *Daniels* does not purport to overrule the longstanding and well established principle that, in ruling on a habeas petition, a federal court is "'bound by the state court's determination of its own law.'"  *Slagle v. Bagley*, 457 F.3d 501, 517 (6th Cir. 2006) (quoting *Davis v. Straub*, 430 F.3d 281, 291 (6th Cir. 2005)); *accord Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)).  The Michigan Court of Appeals's ruling was on an issue of state law; as a matter of comity, that conclusion is binding here, and AEDPA deference is beside the point.  In any event, as explained below the question is not whether this evidence was admissible as a matter of state law, but whether its admission deprived petitioner of a fair trial.

Tr., dated 11/1/07, at 87-90.  During the conversation, petitioner denied having anything to do with the murder and denied knowledge of who did it, *see* Pet., Appx. D, Tr. of Body Wire Conversation, at 21, 40, and counsel highlighted this fact during closing argument, *see* Trial Tr., dated 11/5/07, at 147-50.  Indeed, counsel explicitly told the jury that the "we want you to listen to the wire because we know what's in the wire."  *Id*. at 147-48.  Further, there was direct testimony from both Apker and Richard Lingau that petitioner attempted to hire them, or help her hire somebody, to kill the victim.  *See* Trial Tr., dated 10/25/07, at 202-03; *id*., dated 10/29/07, at 155-56, 161.  In light of this direct testimony, the limited probative value of the supposed adoptive admission, petitioner's denials of any involvement during the conversation, and defense counsel's explicit highlighting of the recorded conversation for the jury, petitioner cannot show that the portion of the recorded conversion admitted as an adoptive admission was so "totally unreliable" that "the factfinder and the adversary system [was not] competent to uncover, recognize, and take due account of its shortcomings."  *Barefoot*, 463 U.S. at 899.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Knife

Petitioner also argues that she was denied a fair trial by the introduction of testimony regarding the knife found by Mallett, because there was no nexus established between the knife and the murder.  The court of appeals concluded that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, and thus the evidence was properly admitted under Rules 401 and 403.  Specifically, the court found that Mallett's testimony that the knife was found in a box packed by defendant "adequately connected the knife with [petitioner]," *Ege III*, at *17, and that Dr. Dragovic's testimony that the tip of the knife used to cause the wound

35

to the victim's spinal cord could have become bent by being pushed through bony structures and that the bent tip of the knife in evidence was consistent with deflection off the vertebrae "adequately connected the knife with the victim's murder." *Id*. at *18. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Mallett's testimony that the knife was found in a box packed by petitioner was sufficient to establish a foundation for its admission, even if it might also have been placed there by someone else. *See United States v. Walker*, 665 F.3d 212, 230 (1st Cir. 2011). Further, Mallett's testimony that the knife had blood on it and Dr. Dragovic's testimony that the bent tip was consistent with the knife having been the murder weapon was sufficient to provide a nexus between the knife and the murder for purposes of determining its admissibility. Under Federal Rule of Evidence 901, which is identical to Michigan Rule of Evidence 901, "[p]roof of the connection of an exhibit to the defendant[] may be made by circumstantial, as well as direct, evidence. The prosecutor need only prove a rational basis from which the jury may concluded that the exhibit did, in fact, belong to the [defendant]." *United States v. Natale*. 526 F.2d 1160, 1173 (2d Cir. 1975). Any questions as to the credibility of Mallett was a matter for the jury to consider going to the weight of the evidence, not a matter of admissibility. *Cf. United States v. Harris*, 493 F.3d 928, 931 (8th Cir. 2007); *United States v. Casto*, 889 F.2d 562, 569-70 (5th Cir. 1989). In short, nothing in the Constitution or the rules of evidence required the prosecution to establish definitively that the knife belonged to petitioner and was used in the murder before it could be admitted, and its admission did not deprive petitioner of a fair trial. *See United States ex rel. Ruddock v. Briley*, 216 F. Supp. 2d 737, 743 (N.D. Ill. 2002). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that she is not entitled to a certificate of appealability. In light of the double deference due the Michigan Court of Appeals's determination under *Jackson* and § 2254(d), it is not reasonably debatable that the prosecution presented sufficient circumstantial evidence to prove petitioner's guilt beyond a reasonable doubt. With respect to the identification issue, it is clear under Supreme Court law that the private photographic line-up which had no police involvement raises no constitutional issue, and it is not reasonably debatable that petitioner failed to point to any evidence to rebut the state courts' findings that the second line-up was not impermissibly suggestive or that the witness's identification was independently reliable. Because Mark Davis's prior assault of his sister was only tangentially related to petitioner's defense and was offered only for the

prohibited purpose of establishing his propensity, and because petitioner was able to present extensive evidence that either Davis or his mother was the killer, the resolution of petitioner's right to present a defense claim is not reasonably debatable. Finally, for the reasons explained above the resolution of petitioner's state law evidentiary claims is not reasonably debatable. Accordingly, the Court should deny petitioner a certificate of appealability.

H.    *Conclusion*

As the Michigan Court of Appeals observed on direct appeal following petitioner's first conviction, "[t]his is a troubling case. The crime is horrific. The initial investigation was deficient. Defendant was not charged until nine years after the murder. There are others who are logical suspects. No one saw defendant at the scene the evening of the murder. No physical evidence links defendant to the crime[.]" *People v. Ege*, No. 173448, 1996 WL 33359075, at *1 n. 1 (Mich. Ct. App. Sept., 17, 1996). Nevertheless, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id*. (quoting *Jackson*, 443 U.S. at 332 n.5 (Stevens, J., concurring in the judgment)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87. Regardless of the troubling facts of the case, the Michigan Court of Appeals applied the correct legal standard to each of petitioner's claims, engaged in a thorough analysis of those claims, and reached a reasonable determination based on

39

the facts and the applicable "clearly established Federal law."  Because the Michigan Court of Appeals's resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law, petitioner is not entitled to habeas relief.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length

unless by motion and order such page limit is extended by the Court.  The response shall address

specifically, and in the same order raised, each issue contained within the objections.


                                          s/Paul J. Komives
                                          PAUL J. KOMIVES
                                          UNITED STATES MAGISTRATE JUDGE

Dated:   November 30, 2012

**Proof of Service**

The undersigned certifies that a copy of the foregoing **Report and Recommendation** was served on the attorneys and parties of record herein by electronic means or U.S. Mail on November 30, 2012.

                              s/Kim Grimes
                              Acting in the Absence of
                              Eddrey Butts, Case Manager